IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| FRANK W. HUBLER, | ) | Case No. 3:21-CV-01384 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION[1]** |

Plaintiff, Frank W. Hubler, pro se, seeks judicial review of the final decision of the

Commissioner of Social Security, denying his application for supplemental security income

("SSI") under Title XVI of the Social Security Act.  Liberally construed, Hubler challenges the

Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ misevaluated

his medically determinable impairments ("MDI") by: (1) misevaluating his hypertension as a

non-severe MDI and failing to find that his obsessive-compulsive disorder ("OCD"), insomnia,

irritable bowel syndrome ("IBS"), diarrhea, arthritis, hammer toes, and a "possible" thyroid issue

were medically determinable impairments; (2) misevaluating his subjective symptom

complaints; and (3) misevaluating his residual functional capacity ("RFC") limitations based on

his hypertension, degenerative disc disease, agoraphobia, and anxiety.  Because the ALJ failed to

apply proper legal standards in evaluating Hubler's RFC in light of his agoraphobia, I

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

recommend that the Commissioner's final decision denying Hubler's application for SSI be vacated and that Hubler's case be remanded for further consideration.

## I.      Procedural History

On May 11, 2018, Hubler applied for SSI.  (Tr. 178-183).  Hubler alleged that he became disabled on October 20, 2008, due to agoraphobia, OCD, anxiety disorder, hypertension, and back problems.  (Tr. 198, 205).  The SSA denied Hubler's application initially and upon reconsideration.  (Tr. 60-73, 75-89).

ALJ Earl Ashford held a hearing on January 24, 2020 and denied Hubler's claim in a September 9, 2020 decision.  (Tr. 11-25, 30-52).  At Step Two of the sequential evaluation process, the ALJ found that Hubler's degenerative disc disease, agoraphobia, and anxiety disorders were severe MDIs but Hubler's hypertension was a non-severe impairment.  (Tr. 14). At Step Four, the ALJ determined that Hubler had the RFC to perform medium work, with the following limitations:

> [P]ostural limitations of occasional climbing of ladders, ropes, or scaffolds; frequent climbing of ramps and stairs; frequent stooping, kneeling, crouching and crawling; and environmental limitations to avoid concentrated exposure to hazards, such as dangerous moving machinery and unprotected heights.  [Hubler] would also be limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes, no interaction with the general public, occasional interaction with coworkers, and supervisors.

(Tr. 17).  Based on vocational expert testimony that a hypothetical individual with Hubler's age, experience, and RFC could perform such available jobs as linen room attendant, press tender, and box bender, the ALJ determined Hubler wasn't disabled.  (Tr. 24).  On June 15, 2021, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On July 20, 2021, Hubler filed a pro se complaint to obtain judicial review.  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Hubler was born on September 5, 1973 and was 35 years old on his alleged onset date. (Tr. 205).  He obtained his GED and had previously worked for a gas company filling gas tanks and as a forklift and machine operator, a packager, and a warehouse worker.  (Tr. 199).

### B.    Relevant Medical Evidence

On July 11, 2017, Hubler presented at Mercy Health's emergency department, complaining of hypertension, a hematoma, and palpitations.  (Tr. 273).  He reported that he had tripped, fallen onto a metal safe in his room, and developed a hematoma approximately five inches tall extending the width of his chest.  *Id.*  He also complained of intermittently feeling a "second heartbeat" that was opposite of his normal heartbeat.  *Id.*  On physical examination, it was noted that Hubler was anxious and mildly hypertensive on arrival.  (Tr. 275).  He had a regular heart rate and rhythm, his lungs were clear, but he was tender to palpitation on his epigastrium.  *Id.*  While there, Hubler underwent a CT scan of his abdomen and pelvis, which indicated that his organs were generally normal.  (Tr. 277).  His soft tissue, however, had "minimal stranding of the subcutaneous soft tissues overlying the xiphoid," and he had mild canal encroachment on one spinal disc.  *Id.*  Hubler also had a CT scan of his chest, which indicated normal findings.  (Tr. 278).  The overall impression was that he had an abdominal wall hematoma, hypertension, and palpitations, and he was discharged the following day.  (Tr. 283).

On July 21, 2017, Hubler was seen at ProMedica Physicians.  (Tr. 303).  He reported the onset of hypertension and continued severe anxiety and agoraphobia, the latter of which started when he was struck by lightning and had been progressing.  *Id.*  Regarding his hypertension, he reported having associated anxiety, chest pain, headaches, malaise/fatigue, and palpitations.  *Id.*

3

As to his anxiety, he reported chest pain, decreased concentration, excessive worry, feelings of choking, insomnia, irritability, malaise, muscle tension, nervous/anxious behavior, palpitations, panic, and restlessness.  (Tr. 303-304).  He reported that the symptoms occurred constantly and were incapacitating in their severity.  (Tr. 304).  On physical examination, he was noted as being oriented to person, place, and time and not having a sickly appearance.  *Id.*  There were no abnormal findings about his heart; his breathing effort and sounds were normal, and his abdomen was tender.  (Tr. 304-305).  His psychiatric behavior was normal, leading the examiner to note that "[d]espite reported issues with severe anxiety patient is very articulate and talks with ease. He is able to describe what is going on with him without any issues."  (Tr. 305).

In assessing his condition, the examiner also noted:

> Very difficult situation.  This is a fairly young man who is essentially bound to his home.  In many ways he doesn't seem to be too troubled by it.  When the discussion of anxiety medication was brought up he was pretty adamant that he doesn't want to be on unnecessary medication.  Long discussion about the medication was had.  He told me that he will think about the medication and research it before he agrees to start on anything.

*Id.*  He was ultimately diagnosed with benign essential hypertension; superficial bruising of the chest wall; primary insomnia, for which he was prescribed medication; and panic disorder with agoraphobia.  (Tr. 305-306).  His high blood pressure medication was also continued.  *Id.*

On September 11, 2017, Hubler returned for a follow-up visit to ProMedica Physicians. (Tr. 309).  He reported that he did not monitor his blood pressure at home, but he had lost weight and was not eating high fat foods.  *Id.*  He also reported dealing with a boil that was draining on the right side of his neck and he continued to struggle with anxiety and agoraphobia.  *Id.*  He was not interested in any psychiatric medication.  *Id.*  As to his hypertension, it was noted that he currently had it controlled.  *Id.*  It also was noted that he was oriented to person, place, and time; he appeared unkempt and not to have showered; and he was "[v]ery articulate in the office and

4

able to express himself." (Tr. 310-311). His medication was continued, and he was given an antibiotic for his boil. (Tr. 311).

On December 21, 2017, Hubler was treated at Unison Behavior Health Group for agoraphobia and a panic disorder. (Tr. 321, 323). He had one diagnostic assessment and one therapy appointment before cancelling his sessions and failing to reschedule them. (Tr. 323). During his assessment, Hubler reported having anxiety about leaving his house, to the point he would become physically ill and have panic attacks, he also reported difficulties sleeping, racing thoughts, and that his symptoms had gotten progressively worse over the years. (Tr. 342). He was assessed with agoraphobia and panic disorder. *Id.*

On January 3, 2018, Hubler had his one therapy session, which indicated that his mood was anxious, his thought process was racing, but he was fully oriented. (Tr. 330). He was pleasant and cooperative in his behavior, spontaneous in his speech, had fair hygiene, and was well groomed. *Id.* He discussed his anxiety with his therapist and the progressive development of his symptoms starting 20 years prior. *Id.* At the end of his session, the therapist noted that Hubler's thought process was racing and his speech was spontaneous. (Tr. 331).

On August 14, 2018, Hubler had imaging done on his spine, which indicated no acute fractures and only mild chronic changes with narrowing of one disc space. (Tr. 397). It also noted mild hypertrophic changes and degenerative changes in the lower lumbar facet joints. *Id.*

On January 21, 2019, Hubler's mother called ProMedica Physicians because he had heard that one of his prescribed antibiotics was carcinogenic and he was "freaking out." (Tr. 415).

On February 15, 2019, Hubler was seen at ProMedica Physicians for a follow-up appointment about his hypertension. (Tr. 413). He reported that he had heart palpitations and anxiety, which caused him to have a hard time sleeping. *Id.* He indicated that his anxiety

5

prevented him from making phone calls and that "he can't even sign his name without getting anxious."  *Id.*  He also requested an antibiotic for a boil on his underarm.  *Id.*  Further, he reported pain in his fingers and issues with crooked second toes.  (Tr. 414).  On physical examination, it was noted that he was very anxious in the office, had disfigured second toes, and enlarged joints in some fingers, but was otherwise normal.  *Id.*  He was diagnosed with benign hypertension, furuncle, and agoraphobia.  (Tr. 415).

###       C.      Relevant Opinion Evidence

####             1.      Consultive Examiner – Jerome Zake, Ph.D.

On January 30, 2019, Hubler underwent a disability evaluation with psychologist Jerome Zake, Ph.D.  (Tr. 404).  Dr. Zake concluded that Hubler presented with severe symptoms of agoraphobia and appeared to have severe symptoms of social anxiety disorder as well.  (Tr. 407). He also reported that Hubler "described having mild to moderate symptoms of an obsessive-compulsive disorder."  *Id.*  He estimated that Hubler's cognitive skills were in the average range, but his anxiety could interfere with his ability to recall and would interfere with his ability to carry out instructions.  *Id.*  Dr. Zake also observed that Hubler had difficulty concentrating on tasks and his persistence was marginal.  (Tr. 407-408).  Further, Dr. Zake noted that Hubler's pace was unremarkable, he appeared extremely uncomfortable around others, isolated himself, distrusted others, and his hyper focus would interfere with his interactions.  (Tr. 408).  He also noted that Hubler would have increased levels of anxiety and distrust when confronted with stress.  *Id.*  He diagnosed Hubler with agoraphobia, social anxiety disorder, and OCD.  *Id.*

####             2.      Consultive Examiner – Ryan Lakin, M.D.

On August 14, 2018, Hubler was seen at Wellcare Clinic by Ryan Lakin, M.D., complaining of chronic lower back pain and psychiatric illness.  (Tr. 390).  He reported being

diagnosed with anxiety, agoraphobia, and OCD and having mild difficulty with prolonged

sitting, standing, walking, repetitive bending/twisting, and lifting/carrying heavy objects.  *Id.*  On

examination, he was noted as being fully oriented with "[n]o obvious psychiatric problems,"

having a decreased range of motion in his dorsolumbar spine, and reporting pain with lumbar

spine flexion.  (Tr. 391).  Otherwise, he was generally observed to be physically and mentally

normal.  (Tr. 391-392).  Dr. Lakin also performed manual muscle testing and found that Hubler

had normal strength and range of motion, except for a minimal reduction in the range of motion

for his dorsolumbar spine.  (Tr. 393-396).  Dr. Lakin diagnosed Hubler with mild intermittent

chronic lower back pain and psychiatric illness.  (Tr. 392).

Dr. Lakin opined that Hubler could frequently lift and carry 10 to 20 pounds for 2 to 6

hours per day, occasionally lift or carry 11 to 50 pounds for 2 hours per day, could sit

continuously with regular breaks, stand and walk occasionally with regular breaks, and his

"ADLS, travel, and communication are normal."  (Tr. 392).  "Any further restrictions related to

psychiatric illness," Dr. Lakin noted, "can be recommended by the treating psychiatrist."  *Id.*

### 3.     State Agency Consultants

#### a.     Physician Consultants

On September 5, 2018, Indira Jasti, M.D., reviewed Hubler's physical limitations based

on the medical evidence.  (Tr. 71-72).  Dr. Jasti found that Hubler could occasionally lift or carry

50 pounds, frequently lift or carry 25 pounds; stand, walk, or sit for 6 hours in an 8-hour

workday; and was unlimited (other than in his lifting and carrying) in his ability to push or pull.

(Tr. 71).  Dr. Jasti also found that Hubler could frequently climb ramps or stairs; occasionally

climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, or crawl, and was unlimited in

his ability to balance.  *Id.*  She did not find that Hubler had any other limitations.  (Tr. 72).  On

January 9, 2019, Diane Manos, M.D., reviewed the medical evidence on reconsideration and affirmed Dr. Jasti's findings.  (Tr. 83-85).

### b.  Psychiatric Consultants

On October 11, 2018, Leslie Rudy, Ph.D., determined that there were insufficient mental health records to conduct a full psychiatric review technique.  (Tr. 69).

On February 16, 2019, Karla Delcour, Ph.D., reconsidered Hubler's mental health records.  (Tr. 85-87).  She found that Hubler had a moderate limitation in his ability to understand and remember detailed instructions but was otherwise not significantly limited in his understanding and memory.  (Tr. 85).  She also found that he was moderately limited in his concentration and persistence, specifically in his ability to: (i) carry out detailed instructions, (ii) maintain attention and concentration for extended periods, (iii) work in coordination with or in proximity to others without being distracted by them, and (iv) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 86).  Otherwise, she found that he was not significantly limited.  *Id.*  Further, Dr. Delcour found that Hubler's ability to socially interact was limited in that he had a marked limitation in his ability to interact appropriately with the general public and moderate limitations in his ability to: (i) accept instructions and respond appropriately to criticism from supervisors, (ii) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and (iii) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  *Id.*  In all other respects, Dr. Delcour found that Hubler was not significantly limited in his social interaction.  *Id.*  Lastly, Dr. Delcour found that Hubler had a moderate limitation in his ability to

respond appropriately to changes in the work setting but was otherwise not significantly limited in his adaptation. (Tr. 87).

### D. Relevant Testimonial Evidence

#### 1. Frank Hubler

Hubler testified at the hearing. (Tr. 36-42). He lived with his mother, could drive, and had completed his GED. (Tr. 36-37). He believed he could not work full-time because of his agoraphobia, OCD, and anxiety disorder, which made it so he could not leave his house "most of the time" and he needed to "prepare" before doing so by, for example, not eating the day before. (Tr. 37). He would also struggle to sleep before going out and have anxiety, panic attacks, stomachaches, and diarrhea. *Id.* He had struggled with these issues since 2008. *Id.* He would leave the house only when he "really [didn't] have a choice," such as renewing his driver's license or taking his mother, who didn't drive, to medical appointments. (Tr. 38). He would start to get uncomfortable when there were more than five or ten people in an area. *Id.* When he would have a panic attack, he would start hyperventilating and have dizzy spells, nausea, and diarrhea. *Id.* He did not receive regular mental healthcare, but he did see his physician, who understood his conditions, once a year for his heart medication. (Tr. 39).

Hubler explained that he could walk about one block, stand for 20 minutes, and stand for 15 to 30 minutes before he would be in pain from his hammer toes and back issues. (Tr. 39-41). He could bend at his waist but could not squat with his knees because his back would cause him trouble standing back up. *Id.* He was not aware of any current lifting restrictions he had but he limited himself to about 5 to 10 pounds because of the arthritis in his right hand. (Tr. 40-41). His arthritis also caused him problems typing, writing, grasping, and lifting. *Id.* When he did not take sleep medication, he slept for about 2 to 5 hours a night due to his insomnia, but with his

9

medication, he slept about 6 to 7 hours.  *Id.*  He would care for his personal hygiene, was capable of cooking, and could not think of any chores that he could not perform.  (Tr. 41-42).  Hubler also testified that he liked computers and would play games to pass the time but had stopped riding dirt bikes and playing sports.  *Id.*

### 2.    Delores Hubler – Frank Hubler's Mother

Delores Hubler, Frank Hubler's mother, also testified at the hearing.  (Tr. 11, 43-46). Her son had lived with her since 2001.  (Tr. 43).  She believed her son was disabled because he had agoraphobia, anxiety, OCD, and "lots of physical problems too," including arthritis and high blood pressure.  (Tr. 43-44).  She would accompany him on his medical appointments, but he did not normally take her to her appointments, except when she had her lung and hip surgeries. (Tr. 44-45).  In addition to his agoraphobia, Delores mentioned that Frank had been struck by lightning about 20 years ago, and she believed it had affected his muscles.  (Tr. 45).  It was after that incident, she stated, that his personality changed, and he became anxious.  (Tr. 46).

## III.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.  Step Two: Medically Determinable Impairments

Liberally construed, Hubler argues that the ALJ misevaluated his MDIs by determining that his hypertension was not a severe impairment and failing to mention his OCD, insomnia, hammer toe, arthritis, diarrhea, IBS, and thyroid condition. *See generally* ECF Doc. 11. The

Commissioner, in context of the ALJ's RFC, contends that the conditions were adequately considered.  ECF Doc. 12 at 8-13.

At Step Two, a claimant has the burden to show that he has at least one "medically determinable impairment" that is a "severe impairment."  20 C.F.R. § 416.920(a)(4)(ii), (c).  An MDI is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory findings.  *See* 20 C.F.R. § 416.921. Whether a condition qualifies as an MDI is determined exclusively on the basis of objective medical evidence; a claimant's statement of symptoms, a diagnosis, or medical opinion will not be used to establish an MDI.  *Id.*  For an impairment to be "severe," it must have lasted or be expected to last for a continuous period of at least 12 months.  20 C.F.R. § 416.929.  If the ALJ concludes that a condition is not a "medically determinable impairment," the ALJ need not consider the condition in determining the RFC.  *Rouse v. Comm'r of Soc. Sec.*, No. 2:16-cv-0223, 2017 U.S. Dist. LEXIS 6172, at *11 (S.D. Ohio Jan. 17, 2017).

The determination of whether a claimant has a severe impairment is a threshold inquiry "intended to 'screen out totally groundless claims.'"  *Nejat v. Comm'r of Soc. Sec*., 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir. 1985)).  If the claimant doesn't show he has at least one "severe" impairment, he's categorically not disabled.  20 C.F.R. § 416.920(c).  If he does satisfy this minimal burden, the ALJ must then consider all of his impairments (even ones that aren't "severe") at the remaining steps in the sequential evaluation.  *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 1996 SSR LEXIS 5 (Jul. 2, 1996)).  And, so long as the ALJ considers all the claimant's impairments in the other steps, any Step Two error is harmless.  *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

12

I find that the ALJ applied the proper legal standards in conducting his Step Two evaluation of the medical evidence.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Hubler's cited conditions generally fall into three categories in terms of their relationship with the ALJ's Step Two discussion: (i) those the ALJ did not reference at all; (ii) those referenced elsewhere in the opinion but not in Step Two; and (iii) those the ALJ specifically addressed at Step Two.

Turning first to those conditions the ALJ did not reference at all (Hubler's hammer toe, arthritis, IBS, thyroid, insomnia, and OCD), the ALJ did not err because there was either no evidence *in the record* to support the condition's existence or what evidence existed did not satisfy the objective records requirement.  The medical evidence in the record does not contain any record indicating Hubler had a thyroid condition or IBS, and only one record references pain in his fingers or that he had "disfigured" toes, doing so based on a physical examination.  (*See* Tr. 414-415).  Thus, the ALJ had no objective medical evidence from which to conclude that Hubler had hammer toe or a thyroid issue or that his fingers were arthritic.  *See* 20 C.F.R. § 416.921.

Hubler's insomnia and OCD present a closer question because he was formally diagnosed with each.  But a diagnosis alone is insufficient to establish the existence of a "medically determinable impairment."  *Id.*  There are multiple records indicating that Hubler had difficulty sleeping.  (*See* Tr. 37, 41, 303-306, 413).  But generally, these records relayed Hubler's own complaints or discussed his insomnia as a symptom of his anxiety, rather than as a condition in its own right; neither of which are grounds for finding it to be an MDI.  *See* 20 C.F.R. § 416.921.  Dr. Zake's OCD diagnosis presents a more complicated analysis because the lack of treatment records can itself be a symptom of the individual's mental condition.  *See Denham v. Comm'r of Soc. Sec.*, No. 1:14-cv-611, 2015 U.S. Dist. LEXIS 125315, at *35-36 (S.D. Ohio Sept. 18, 2015)

("Sixth Circuit law is clear that "ALJs must be careful not to assume that a patient's failure to receive mental-health treatment evidences a tranquil mental state.  For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." (quoting *White v. Comm'r of Social Security*, 572 F.3d 272, 283 (6th Cir. 2009)).

Unlike Hubler's anxiety and agoraphobia, which were well documented, Hubler's OCD is only mentioned in Dr. Zake's record.  Moreover, nothing in Dr. Zake's treatment note indicates that objective testing was performed to confirm an OCD diagnosis.  (*See* Tr. 404-408).  Rather, Dr. Zake's record indicates that Hubler described such symptoms to him.  (*See* Tr. 404).  That limited basis – without more – does not provide sufficient evidence upon which an ALJ could conclude that Hubler's condition had or was likely to last over 12 months or that it was necessarily based on sufficient objective medical evidence to be an MDI.  *See* 20 C.F.R. § 416.921.  Thus, the ALJ did not err in failing to discuss the conditions, because the ALJ had no basis upon which to conclude that they were MDIs.

Second, the ALJ's failure to specifically discuss Hubler's diarrhea was not an error and, in any event, would be harmless as the ALJ identified other severe impairments and discussed the condition elsewhere in the opinion.  Throughout the medical records, Hubler's diarrhea was discussed as a symptom of his anxiety rather than its own condition and, consequently, the ALJ was not obligated to include it in his analysis under Step Two.  *See* 20 C.F.R. § 416.921.  Even assuming the ALJ should have discussed it at Step Two, the error was harmless because the ALJ discussed it in his RFC analysis and identified Hubler's degenerative disc disease, agoraphobia, and anxiety as severe impairments.  *See Nejat*, 359 F. App'x at 577; (Tr. 14, 18, 20).

Lastly, as to Hubler's hypertension, the ALJ applied the proper legal standards and reached a decision supported by substantial evidence in finding that it was a non-severe

14

impairment.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ referenced treatment notes

indicating Hubler's mild hypertensive status and his reported heart palpitations.  (Tr. 14).  But

the ALJ also noted the records indicating that the condition was controlled with medication and

the lack of any evidence suggesting it had caused serious damage or progressed to cause cardiac

trouble.  *Id.*  As such, the ALJ properly evaluated the condition and determined it did not meet

the requirements under 20 C.F.R. § 416.921.  Moreover, substantial evidence supported this

finding, such as: (1) the lone hospital record indicating Hubler was mildly hypertensive

(Tr. 275); (2) treatment records indicating his condition was controlled with medication,

(Tr. 305-306, 309, 415); and (3) the lack of any other records indicating Hubler's hypertension

caused significant limitations.  *Biestek*, 139 S. Ct. at 1154.  Accordingly, because the ALJ

applied the proper legal standards and was supported by substantial evidence or the record's

silence as to the above conditions, the ALJ's decision in this regard should be affirmed.

> **C.    Step Four: Subjective Symptoms Complaints**

Liberally construed, Hubler also contends that the ALJ erred in evaluating his subjective

symptoms complaints.[2]  *See generally* ECF Doc. 11-1 at 1.  The Commissioner did not address

this argument in her brief.  *See generally* ECF Doc. 12.

A claimant's subjective symptom complaints are among the evidence that an ALJ must

consider in assessing a claimant's RFC at Step Four.  *See* 20 C.F.R. § 416.920(e); *Blankenship v.*

*Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms

may support a claim of disability.").  Generally, an ALJ must explain whether he finds the

claimant's subjective complaints consistent with objective medical evidence and other evidence

---

[2] Hubler attaches to his pro se complaint a portion of Dr. Zake's disability evaluation report that has the language "Mr. Hubler's accuracy and credibility appeared consistent" circled.  *See* ECF Doc. 11-1 at 1. Given Hubler's pro se status and out of an abundance of caution, I will treat this as asserting a claim that the ALJ misevaluated his subjective symptom complaints.

in the record.  SSR 16-3p, 2016 SSR LEXIS 4, *15 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (noting that the ALJ must clearly explain his reasons for discounting subjective complaints).  In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate his symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4, *15-19; 20 C.F.R. § 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (finding that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports his decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints.") (quotation omitted); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'") (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000).

The ALJ applied the proper legal standards and reached a determination supported by substantial evidence in finding Hubler's subjective symptoms complaints were inconsistent with the record evidence.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Here, the ALJ acknowledged his obligation to consider the factors delineated in SSR 16-3p and reviewed Hubler's physical and mental health-related complaints.  (Tr. 17-22).  On that basis, the ALJ provided a general statement that the treatment record did not support his allegations and then, albeit interwoven with his medical record summary, noted the various inconsistencies he found persuasive.  Specifically, the ALJ noted Hubler's history of conservative treatment, his limited treatment

record, his decision not to take mental health medication, and treatment notes indicating he appeared to have mild, if any, mental health limitations during appointments. *Id.* Because we read an ALJ's decision as a whole and with common sense, the interwoven nature of the ALJ's discussion was not an error. *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010) (noting that we "read the ALJ's decision as a whole and with common sense").

It is, however, concerning that the ALJ referenced the lack of other forms of treatment as part of his discussion of Hubler's conservative treatment history. (*See* Tr. 19). When evaluating a claimant's mental health, the failure to seek treatment for a mental impairment should not be a determinative factor in assessing the individual's statements. *See Boulis-Gosch v. Comm'r*, 451 F. App'x 488, 493 (6th Cir. 2011). There is no error, however, when the lack of records is considered alongside other factors, and none were dispositive. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 638-39 (6th Cir. 2016) (holding that an ALJ did not err in considering the claimant's missed or canceled health appointments when considered with other factors and none were dispositive). Here, the ALJ considered Hubler's failure to seek additional treatment as one of many considerations (as noted above) for finding his subjective symptom complaints were inconsistent with the record evidence. Thus, those other factors enabled the ALJ to explain why the lack of treatment, along with the other inconsistencies, led to his conclusion. *See* SSR 16-3p, 2016 SSR LEXIS 4, at *15; *Felisky*, 35 F.3d at 1036.

Moreover, the ALJ's conclusion was supported by substantial evidence. 42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241. As to Hubler's physical impairments, such evidence includes: (1) treatment notes indicating his hypertension was controlled or only mild (Tr. 275, 305-306, 309, 415); (2) imaging indicating that Hubler had minor compression in one spinal disc (Tr. 397); and (3) Hubler's testimony that his back did not prevent him from doing any chores

17

(Tr. 40).  As to Hubler's mental health complaints, such evidence includes: (1) treatment notes indicating Hubler did not appear to have any mental health conditions (Tr. 305, 311, 391); and (2) Dr. Delcour's opinion that Hubler had only moderate limitations (Tr. 85-87).  *Biestek*, 139 S. Ct. at 1154.  Accordingly, because the ALJ's finding was supported by substantial evidence, it falls within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.  And I recommend that Hubler's argument on this point be rejected and the decision be affirmed.

### D.      Step Four: Residual Functional Capacity

Liberally construed, Hubler contends that the ALJ erred in evaluating his RFC by failing to attribute greater limitations from his hypertension, degenerative disc disease, agoraphobia, and anxiety.  *See generally* ECF Doc. 11.  He notes that he has been meeting his doctors online and has only left his house once since January 2020, when he moved.  ECF Doc. 11 at 2.  The Commissioner disagrees.  *See generally* ECF Doc. 12 at 8-14.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

I find that, although the ALJ properly evaluated Hubler's physical impairments and anxiety, the ALJ failed to apply the proper legal standards in determining Hubler's RFC in light

of his agoraphobia.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Physically, Hubler contends that the ALJ misevaluated the limitations from his hypertension and degenerative disc disease. The ALJ reviewed the medical records referencing Hubler's hypertension and reasonably found that they did not support significant restrictions.  (*See* Tr. 19-20).  And throughout the treatment notes, Hubler's hypertension was noted as controlled.  (*See* Tr. 305-306, 309, 415).  The sole exception was when he was found to be "mildly hypertensive" upon arriving at the hospital for medical treatment after a fall.  (*See* Tr. 275).  Consequently, the ALJ complied with the regulations, and his decision that Hubler's hypertension did not result in any more significant impairments was supported by supported by substantial evidence.  20 C.F.R. § 416.920(e); *Biestek*, 139 S. Ct. at 1154.

Likewise, the ALJ appropriately considered the medical evidence and possible limitations resulting from Hubler's degenerative disc disease, by reviewing the imaging of his spine, considering his conservative treatment, and evaluating Hubler's normal range of motion and strength.  (*See* Tr. 17-20).  The ALJ noted Hubler's testimony that he had persistent lower back pain which caused him minor difficulties, as well as the imaging identifying mild degenerative changes in his lower back.  (Tr. 18-19).  From this, the ALJ determined that Hubler had various postural limitations, such as only occasional climbing of ladders and ropes, or frequent stooping, kneeling, crouching, and crawling.  *See* SSR 96-8p, 1996 SSR LEXIS 5; (Tr. 17).  Substantial evidence, as cited by the ALJ, supported these limitations, including: (1) the imaging of his spine indicating that Hubler had only mild chronic changes with the narrowing of one disc space (Tr. 397); (2) Dr. Delcour's opinion, who found the same postural limitations (Tr. 85-87); and (3) Dr. Lakin's finding that Hubler had a full range of motion save for minimal range of motion reductions in his dorsolumbar spine (Tr. 393-396).  *Biestek*, 139 S. Ct. at 1154.

The real issue with the ALJ's analysis stems from his treatment of Hubler's anxiety and agoraphobia.  The evaluation of mental health limitations is complicated from the start and is made even more so in this case by the limited treatment record.  Nevertheless, the lack of records may not be used as the sole justification for discounting a claimant's condition.  *See Boulis-Gasche*, 451 F. App'x at 493 ("We have held that a claimant's failure to seek formal mental health treatment is 'hardly probative' of whether the claimant suffers from a mental impairment'" (quoting *Burton v. Apfel,* 208 F.3d 212 (6th Cir. 2000) (table)); *see also Denham*, 2015 U.S. Dist. LEXIS 125315, at *35-36.

> Here, the ALJ indicated that Hubler had a minimal treatment record, stating:

> [W]ith his mental complaints, there is no evidence of in-patient psychiatric hospitalization, emergency room visits, residential services, counseling, extensive case management services, or other intensive forms of interventions. . . .  The claimant's limited treatment record supports the determination that he is able to work at the assigned residual functional capacity.

(Tr. 19).  As to Hubler's anxiety, this statement is concerning but not dispositive in light of other parts of the ALJ's analysis.  For example, the ALJ also referenced treatment notes indicating Hubler spoke with ease when at medical appointments, described his health concerns without any issues, and had "no obvious psychiatric problems."  (Tr. 21).  This additional analysis saved the ALJ's discussion of Hubler's anxiety because it demonstrated that other factors were also considered, and none was treated dispositively.  *Kepke*, 636 F. App'x at 638-39.  Moreover, although there are treatment records referencing Hubler's anxious behavior (Tr. 275, 330, 414-415), "when a record presents substantial evidence supporting two contrary conclusions, a reviewing court must affirm the findings of the Commissioner."  *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 960 (N.D. Ohio Jun. 24, 2003) (citing *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)).  And substantial evidence supports the ALJ's conclusion, as the treatment records indicate that (i) during his medical appointments Hubler appeared normal (Tr. 305,

20

310-311, 391); and (ii) Dr. Delcour agreed that he was, generally, only moderately limited in the areas of mental functioning (Tr. 85-87). As a result, the ALJ appropriately considered the record evidence and reached a decision supported by substantial evidence in determining the limitations related to Hubler's anxiety. *Biestek*, 139 S. Ct. at 1154.

The issue becomes more complicated when we examine the ALJ's evaluation of Hubler's agoraphobia. The U.S. Court of Appeals for the Third Circuit has described agoraphobia as "an intense, irrational fear of open spaces, characterized by a marked fear of being alone or of being in public places where escape would be difficult and may be associated with panic attacks." *Thelosen v. Comm'r of Soc. Sec.*, 384 F. App'x 86, 90 n.4 (3d Cir. 2010) (citing Dorland's Illustrated Med. Dictionary at 40 (30th ed. 2003)). In this regard, the ALJ failed to provide any distinct, clear analysis or discussion of Hubler's ability to leave his home. (*See* Tr. 17-23). The ALJ referenced Hubler's testimony regarding his fear of leaving home and his formal diagnoses of agoraphobia. (Tr. 18). But he never connected those fears or the diagnosis to any specific limitation (such as limitations on Hubler's lack of away-from-home social interactions or potential absenteeism); nor did he explain whether he concluded that Hubler's agoraphobia did not warrant any limitations at all.

It may very well be that the ALJ's limitations on social interaction were intended to account for Hubler's anxiety-based *and* agoraphobia-based limitations. Courts are divided on whether such limitations adequately address the nature of agoraphobic fears. *Compare Jessica L. H. v. Kijakazi*, No. 6:20-CV-00065, 2021 U.S. Dist. LEXIS 250231, *12-13 (N.D. Texas Nov. 30, 2021)("[A]lthough the RFC provides limitations for certain interpersonal interactions, it provides no limitation for Plaintiff's agoraphobia and anxiety-related symptoms . . . because the RFC requires Plaintiff to function in a work setting.") *with Jones v. Kijakazi*, No. 20-1074-SRF,

2022 U.S. Dist. LEXIS 63672, *20-22 (D.C. Del. Apr. 5, 2022) (finding that the ALJ's limitations on traveling as part of the plaintiff's work responsibilities, decision making, and social interactions addressed her agoraphobia impairment); *see also King v. Saul*, No. 1:19-CV-00738, 2020 U.S. Dist. LEXIS 248927, *44-47 (S.D. W. Va. Jul. 13, 2020) (finding that the ALJ's social limitations adequately accounted for the plaintiff's agoraphobia).  Providing an assessment about how a claimant might be able to perform once he is *at* work does not necessarily address whether that person will even be able to leave the house *to go to* work.

Here, the ALJ's analysis leaves a gap that this court cannot fill in on its own or by any common sense reading of the decision.  An RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)."  SSR 96-8p, 1996 SSR LEXIS 5.  And here, the ALJ's murky and interwoven discussion of Hubler's anxiety and agoraphobia makes such a conclusion far too speculative for the court to satisfy its obligation to provide meaningful review.  As a result, the ALJ failed to build a logical bridge between the medical evidence and the RFC as to Hubler's agoraphobia.  *See Fleischer*, 774 F. Supp. 2d at 877.  The ALJ's decision should be remanded.

## IV.    Recommendation

Because the ALJ failed to apply proper legal standards in evaluating Hubler's agoraphobia, I recommend that the Commissioner's final decision denying Hubler's application for SSI be vacated and that Hubler's case be remanded for further consideration.  In all other respects, the ALJ's decision should be upheld.

Dated: June 3, 2022

Thomas M. Parker
United States Magistrate Judge

---

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).